UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bremer Bank, National Association,

            Plaintiff,

    v.

John Hancock Life Insurance Company,

           Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 06-1534 ADM/JSM

Paul L. Ratelle, Esq., Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, appeared for and on behalf of Plaintiff Bremer Bank, National Association.

David S. Cohen, Esq., and Risa M. Rosenberg, Esq., Milbank, Tweed, Hadley & McCloy LLP, Washington, D.C., and Patrick J. McLaughlin, Esq., Dorsey & Whitney LLP, Minneapolis, MN, appeared for and on behalf of Defendant John Hancock Life Insurance Company.

## I. INTRODUCTION

On May 1, 2006, oral argument before the undersigned United States District Judge was heard on Plaintiff Bremer Bank, National Association's ("Bremer" or "Plaintiff") Motion for Temporary Restraining Order ("TRO") [Docket No. 5] directed to Defendant John Hancock Life Insurance Company ("Hancock" or "Defendant"). For the reasons set forth herein, the Motion is denied.

## II. BACKGROUND

Northwest Airlines, Inc. ("NWA") filed petitions for bankruptcy under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York on September 14, 2005.[1] Following the bankruptcy filing, NWA sought to reject certain leases on aircraft. Aircraft N526US (the "Aircraft") was designated as a potential

---

[1] The bankruptcy court's internal case number for the NWA bankruptcy is 05-17930.

candidate for lease rejection. Def.'s Mem. [Docket No. 14] Ex. A. The Aircraft is the subject of a number of agreements. These include a lease between NWA and First National Bank of Boston (the "Lease"). Additionally, a Participation Agreement exists. The parties to the Participation Agreement include Bremer, as one of a number of Owner Participants; NWA, as Lessee; Hancock, as Loan Participant; and U.S. Bank National Association, as the Owner Trustee and Indenture Trustee. Bygd Aff. [Docket No. 6] ¶¶ 3, 5, 7. Finally, a third agreement, the Indenture, exists between the First National Bank of Boston and the Connecticut Bank and Trust Company. The bankruptcy court has granted permission to NWA to reject the Lease. Def.'s Mem. Ex. B.

Attempting to avoid an outright rejection of the lease, the Indenture Trustee and Hancock began negotiations with NWA. Bremer was apprised of these conversations. During the negotiation period, various stipulations (the "Stipulations") were agreed to under section 1110(b) of the Bankruptcy Code extending the automatic stay applicable to the Aircraft. Bremer was a party to the Stipulations. Def.'s Mem. Ex. C. The Stipulations afforded the parties additional time to renegotiate the Lease; additionally, it required NWA to protect the Aircraft. Ultimately, the negotiating parties agreed to a Summary of Terms and Conditions for the restructuring of the Lease for which approval from the bankruptcy court was sought. Bygd Aff. Ex. 2. Bremer filed Objections to the motion for approval of the restructured agreement on March 10, 2006.

On March 28, 2006, the bankruptcy court held a hearing on the motion to approve the Summary of Terms and Conditions (the "Rejection Motion"). Bremer was represented by counsel at the hearing, and argued in support of its Objections. Nevertheless, the bankruptcy court approved the Summary of Terms and Conditions, and permitted the Indenture Trustee to

foreclose on Bremer's interest in the Aircraft. The bankruptcy court adjourned the Rejection Motion hearing until May 9, 2006, with Bremer acknowledging that a foreclosure hearing may occur before that time.

Also on March 28, 2006, the Indenture Trustee sent its Notice of Acceleration and Public Sale of Collateral to NWA and Bremer, noticing a public sale of the Aircraft on May 2, 2006. The Indenture Trustee amended the notice two days later. On April 24, 2006, Bremer filed the instant lawsuit. On April 26, 2006, counsel for Bremer sent email copies of the Complaint [Docket No. 1], the Motion, and Bremer's memorandum in support of the Motion to Hancock's counsel. Hancock was served on April 27, 2006.

### III. DISCUSSION

In determining whether injunctive relief is appropriate, courts must balance the four factors outlined in Dataphase Sys., Inc. v. C.L. Sys.,Inc., 640 F.2d 109, 113-14 (8th Cir. 1981) before granting injunctive relief. These factors include: (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.

**A.      Likelihood of Success on the Merits**

Although Dataphase lists this as the final factor for consideration, likelihood of success on the merits is often the most significant of the four factors considered by courts in determining whether to issue a temporary restraining order. Shrink Missouri Gov't PAC v. Adams, 151 F.3d 763, 764 (8th Cir. 1998). Here, it can not be said that Bremer's breach of contract claim, based

on numerous agreements constituting a complex transaction that has not been fully fleshed out in the instant litigation, is sufficiently strong to warrant the grant of a temporary restraining order. Although the Court passes no final judgment on the merits of the claim, a number of factors weigh against Bremer's Motion.

First, the issue of timeliness complicates giving Bremer the extraordinary injunctive relief sought. As noted in the procedural history, the Indenture Trustee sent an Amended Notice of Acceleration and Public Sale of Collateral on March 30, 2006, just two days after the Rejection Motion. However, this action was not filed until April 24, 2006, with the TRO request following a day later. At oral argument, Bremer's only proffered explanation for delay was that the issues in this action are complicated. Even granting Bremer's assertion that the transaction is complicated, Bremer can not reasonably assert that it was somehow unfamiliar with the transactions. In fact, the issues raised in this action are related to, if not the same as, those raised previously before the bankruptcy court.

An emergency created by a party's inaction is generally afforded less consideration than a scenario in which the emergency is beyond the party's control. Lydo Enter., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief"); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); Forry, Inc. v. Neundorfer, Inc., 837 F.2d 259, 267 (6th Cir. 1988). In relation to a motion for a TRO, the doctrine of laches applies where a party seeking an injunction engages in unreasonable delay which results in prejudice to the other party. Citizens and Landowners Against the Miles City/New Underwood Powerline v. United States Dept. of Energy, 683 F.2d 1171, 1175 (8th Cir. 1982) (laches is "properly invoked when a party seeking

injunctive relief has engaged in unreasonable and inexcusable delay which results in undue prejudice to the other party"). Here, there is no reasonable explanation as to why Bremer did not bring its claim in a timely fashion. Moreover, although Bremer argues Hancock will not be prejudiced if the sale is delayed, it is possible that in the fluid market for aircraft, one of the two currently known potential bidders[2] at the foreclosure sale may withdraw if the foreclosure is postponed. As a result, Hancock faces a risk of prejudice occasioned by Bremer's unexplained delay in filing this Motion.

Additionally, Hancock alleges that Bremer has failed to name the Indentured Trustee as a necessary party. It is well-established that a party is a necessary party if complete relief can not be accorded among those who are already parties, or, if the action would interfere with the absent party's right to present and defend its interests. Dominium Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 725 (8th Cir. 2001). In the instant action, the Indenture Trustee is the only party that holds both a recorded lien interest in the Aircraft and the exclusive right to foreclose upon the Aircraft. Consequently, the Indenture Trustee plays a key role in this action, as it is the only party that can foreclose upon the Aircraft. Although Bremer admits that the Indenture Trustee is the party with the power to foreclose on the Aircraft, it argues that Hancock, as majority stakeholder, is essentially dictating the Indenture Trustee's actions, claiming that it would be "highly unusual" for the Indenture Trustee to not adhere to Hancock's wishes in regard to foreclosure on the Aircraft. Even if Bremer's assertion is correct, the fact that one party may have great influence over another, unnamed necessary party does not render that party

---

[2] Hancock's counsel proffered at oral argument that two bidders have met the bonding requirement to bid on the Aircraft.

unnecessary to the litigation. Because it appears that the Indenture Trustee is a necessary party, it is unlikely that Bremer can succeed on the merits of the case as currently constituted.

**B.     Irreparable Harm**

At oral argument, Bremer's counsel was asked if monetary damages would sufficiently compensate Bremer, should the TRO not be granted but ultimately Bremer was successful on the merits of the case. Bremer's counsel did not directly respond to the question, instead arguing that a danger exists that the foreclosure sale will not comport with the New York Uniform Commercial Code, that it may lose standing in bankruptcy court, and that the foreclosure sale will make it difficult to discern whether the purchase price for the Aircraft is appropriate. In its brief, Bremer heavily relies upon the contention that it will be difficult to accurately determine Bremer's damages after foreclosure, and therefore, granting the temporary restraining order is preferable to attempting to allocate damage amounts after the fact.

Bremer's arguments that it will be irreparably harmed by the foreclosure sale are unconvincing. Courts routinely determine damages in cases similar to this through the use of experts and comparable sales. Nothing proffered here suggests that this case presents a situation sufficiently unique that damages can not be later determined. Nor has Bremer shown that it will be irreparably harmed by the foreclosure sale. Thus, this Dataphase factor weighs in favor of denial of the Motion.

**C.     Harm to the Parties**

Bremer argues that the balance of harms to the parties favors granting its Motion, stressing that its interest in the Aircraft should not be foreclosed. Bremer claims that, should the Motion be granted and the foreclosure sale delayed, virtually no harm will befall Hancock,

because NWA will continue to pay Hancock under the Stipulations signed by Hancock and NWA. At oral argument, however, Hancock represented that two parties have made the necessary deposits to bid at the foreclosure sale. Therefore, a delay in the foreclosure sale could potentially adversely affect the sale, should one of the bidders withdraw, or if other market factors, such as fuel prices or additional airline bankruptcies, threaten the airplane market. In any event, Bremer's harms, as detailed previously, are not sufficient to meet the burden established by Dataphase.

**D.      Public Interest**

In the instant case, the public interest has little weight in the analysis. Bremer identifies the public's interest in ensuring that parties honor their contractual commitments. This is an unassailably correct statement; however, given that Bremer has not demonstrated likelihood of success on the merits or irreparable harm, it can not overcome the weight of the Dataphase factors against granting the TRO.

### IV. CONCLUSION

For the reasons stated on the record, and based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order [Docket No. 5] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery  
ANN D. MONTGOMERY  
U.S. DISTRICT JUDGE

Dated: May 2, 2006.