## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bremer Bank, National Association,
a national banking association,

                Plaintiff,

v.

John Hancock Life Insurance Company,
a Massachusetts Corporation, and U.S. Bank,
National Association,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 06-1534 ADM/JSM

---

Paul L. Ratelle, Esq., Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, on behalf of Plaintiff.

David S. Cohen, Esq. and Daniel DeSouza, Esq., Milbank, Tweed, Hadley & McCloy LLP, Washington, DC; and Patrick J. McLaughlin, Esq., and Todd C. Pearson, Esq, Dorsey & Whitney, LLP, Minneapolis, MN, on behalf of Defendant John Hancock Life Insurance Company.

Matthew A. Martel, Esq., Michael T. Gass, Esq., and Richard Hiersteiner, Esq., Edwards, Angell, Palmer & Dodge LLP, Boston, MA; and Patrick J. McLaughlin, Esq., Dorsey & Whitney, LLP, Minneapolis, MN, on behalf of Defendant U.S. Bank, National Association.

---

## I. INTRODUCTION

On December 15, 2008, the undersigned United States District Judge heard oral argument on Defendants John Hancock Life Insurance Company ("Hancock") and U.S. Bank, National Association's ("U.S. Bank") (collectively "Defendants") Joint Motion for Summary Judgment [Docket No. 135] and Plaintiff Bremer Bank, National Association's ("Bremer") Motion for Partial Summary Judgment [Docket No. 141]. For the reasons stated herein, Defendants' Motion is granted in part and denied in part and Plaintiff's Motion is denied.

## II. BACKGROUND[1]

On April 9, 2007, this Court issued an Order [Docket No. 67] denying Hancock's Motion for Judgment on the Pleadings [Docket No. 52].  As discussed in the April 9, 2007 Order, this litigation concerns a Boeing 757-251 aircraft (the "Aircraft"); the financing mechanism, commonly known as a "leveraged lease transaction," employed to purchase the Aircraft and lease it to Northwest Airlines, Inc. ("Northwest"); the numerous documents associated with the transaction (the "Operative Documents"); the rights and obligations of the various participants (or successors-in-interest) to the transaction; and the filing of bankruptcy by Northwest, which ultimately led to a rejection of the lease and then the foreclosure of Bremer's equity interest in the Aircraft.  April 9, 2007 Order at 1-6.

### A.  The Leveraged Lease Transaction

The acquisition, finance, and lease of the Aircraft was accomplished through an aircraft leveraged lease transaction.  Second Am. Compl. [Docket No. 71] ¶ 8.  The Operative Documents that memorialize the transaction include the "Participation Agreement," an "Indenture," a "Trust Agreement," a "Lease," and "Secured Certificates."[2]  Id. ¶¶ 9, 11, Exs. A, B, C, D.  There is also an "Assignment Agreement."  Id. ¶ 13, Ex. E.  A number of parties were ultimately involved in the transaction, including an "Owner Participant," a "Loan Participant,"

---

[1]  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  As both parties have moved for summary judgment, any disputed facts are noted.

[2]  Many of these documents were amended over time, but the history of the amendments, while important, will not be set forth unless relevant to the issue presented herein.

an "Owner Trustee," an "Indenture Trustee," a "Certificate Holder," and a "Lessee."[3]  Id. ¶ 8.

Although the parties in this case were not the original participants in the transaction, Bremer is

the current Owner Participant, Hancock is the current Loan Participant, and U.S. Bank is both

the current Owner Trustee and the current Indenture Trustee.  Id. ¶¶ 8a-d, 13, 16.

The original Owner Participant made an equity investment to pay a portion of the

purchase price of the Aircraft and authorized the Owner Trustee to obtain a loan to pay the

balance.[4]  Id. ¶¶ 8, 11a.  The Owner Trustee then held the Aircraft and Lease in trust for the

benefit of the Owner Participant, and leased the Aircraft to the Lessee, Northwest.  Id. ¶¶ 11a, b.

Under the Trust Agreement, the Owner Participant has a right to deliver binding instructions to

the Owner Trustee.  Id. ¶ 25.

The original Owner Trustee and the original Indenture Trustee entered into the Indenture,

pursuant to which the original Owner Trustee (1) issued Secured Certificates to the original Loan

Participant to evidence the loans being made, and (2) granted a security interest in the Aircraft

and the Lease to the original Indenture Trustee to secure the payment of the original Secured

Certificates.  Id. ¶¶ 11c, 8e.  The Secured Certificates were later refinanced, and other entities

acquired Secured Certificates to become Certificate Holders and Loan Participants.  Id. ¶ 12.  In

aircraft leveraged lease transactions, the parties agree that the cash flow from the lease payments

will pay the principal of, and interest on, the debt incurred to finance the purchase of the aircraft.

---

[3] All of the current parties, now stand in the place of the original parties to this
transaction except for Northwest, an original party.  An explanation of the identities of the
original parties is not relevant to this Order.

[4] Typically, the equity investment amounts to 20% of the cost of aircraft, while debt
financing funds the remaining 80%.  Cohen Decl. [Docket No. 139], Ex. E at 3.

Id. ¶ 19.  Hancock holds a sufficient percentage of the outstanding principal amount of the

Secured Certificates to constitute a "Majority in Interest of Certificate Holders," which gives

Hancock the right to issue binding instructions to the Indenture Trustee concerning the exercise

of remedies under the Indenture in an event of default.  Id. ¶ 17, Ex. B § 5.01-.02.  The terms of

the Indenture indemnify the Indenture Trustee for following the Certificate Holder's instructions.

Id. ¶ 18, Ex. B. § 5.03.

The Indenture includes an "equity squeeze protection" clause, which protects the Owner

Participant, Bremer, against the loss of its equity position in the transaction if the Lessee,

Northwest, defaults under the lease.  Id. ¶¶ 20, 21, Ex. B § 4.04(a).  Bremer claims that the

clause requires that in the event of a default under the Lease, the Indenture Trustee, U.S. Bank,

must first exercise remedies under the Lease against Northwest before exercising remedies under

the Indenture against Bremer's equity interest as Owner Participant.  An attempt by the

Indenture Trustee to foreclose on the Owner Participant's equity interest before exercising

remedies under the Lease against the defaulting Lessee is commonly known in the aircraft

industry as an "equity squeeze."  Id.

**B.    Northwest's Bankruptcy and Rejection of the Lease**

On September 14, 2005, Northwest filed petitions for bankruptcy in the United States

Bankruptcy Court for the Southern District of New York under Chapter 11 of the United States

Bankruptcy Code.  Id. ¶ 27.  Shortly thereafter, Northwest filed a motion to reject or abandon

certain aircraft leases, which identified, among others, the Aircraft as a "Potential Excess

Aircraft" that could benefit Northwest "if the lease or debt terms were revised."  Id.  ¶ 29, Ex. F-

1.  Also during the same time period, Hancock contacted Bremer, which apparently indicated no

intention to become involved in the renegotiation of the terms of the Lease.  Cohen Decl., Ex. M at 22.  The bankruptcy court granted Northwest's motion on October 18, 2005, and gave Northwest 45 days to negotiate revised lease terms.  Second Am. Comp. ¶ 29, Ex. F-2.

Northwest's bankruptcy also triggered the statutory remedies available to aircraft financiers under Section 1110 of the Bankruptcy Code, 11 U.S.C. § 1110.  Id. ¶ 30.  Under Section 1110, Northwest is required, within 60 days after the commencement of the bankruptcy case, to make a "1110 Election" by either agreeing to perform the Lease and cure any defaults thereunder or relinquish possession of the Aircraft to the Lessor.  Id.  Shortly before the 60-day period under Section 1110 expired, Hancock instructed the Indenture Trustee to enter into a series of stipulations (the "Stipulations") with Northwest pursuant to 11 U.S.C. § 1110(b).  Id. ¶ 31; Ratelle Aff. [Docket No. 144], Ex. D.  Ultimately, the Stipulations (1) extended the 60 day period under 11 U.S.C. § 1110(a)(2) with respect to the Aircraft through May 2006 (the "extension period") and (2) limited Northwest's obligation to make payments under the Lease to $130,000 per month during the extension period.  Second Am. Compl. ¶ 31, Ex. G.  Also, the Stipulations provided that if Northwest failed to perform an obligation under the Stipulation, the failure constituted an event of default and permitted the Indenture Trustee to exercise any rights, claims, and remedies under the Operative Documents.  Ratelle Aff., Ex. G ¶ 15.

On March 2, 2006, having reached an agreement with the Indenture Trustee and the Certificate Holders to enter into a new lease agreement, Northwest filed a Motion ("Rejection/New Lease Motion") in bankruptcy court seeking approval of a term sheet, pursuant to which Northwest would (1) reject the Lease, (2) agree to an unsecured claim of $15,000,000 for rejection damages in favor of the Indenture Trustee, and (3) enter into a new lease.  Second

Am. Compl. ¶ 32, Ex. H.  Bremer filed an objection to the Rejection/New Lease Motion on

March 10, 2006.  Id. ¶ 34, Ex. I.  At a hearing on March 28, 2006, Hancock appeared and argued

against Bremer's objection.  Id. ¶ 35, Ex. J.  The bankruptcy court did not grant the

Rejection/New Lease Motion but did approve the "Summary of Terms and Conditions" and

adjourned the hearing to permit the Indenture Trustee to foreclose on Bremer's equity interest,

which would render Bremer's objection moot.  See May 2, 2006 Order [Docket No. 17] at 2-3.

The bankruptcy court continued the hearing to May 2006 to hear testimony on valuation and the

commercial reasonableness of the proposed new lease transactions.   Second Am. Compl. ¶ 35,

Ex. J at 50; Cohen Decl., Ex. P at 50-51.  Bremer did not object to the course of action

contemplated by the bankruptcy court's decision.

## C.    Foreclosure

On March 30, 2006, the Indenture Trustee, following Hancock's instructions, served the

Owner Trustee and Bremer with an Acceleration Notice and Notice of Public Sale of Collateral,

accelerating the payment of the Secured Certificates and setting May 2, 2006, as the date for a

public auction foreclosing Bremer's equity interest in the trust indenture estate.  Second Am.

Compl. ¶ 36, Ex. K.  Bremer then filed the original Complaint [Docket No. 1] in this proceeding

on April 24, 2006, as well as an Application for a Temporary Restraining Order ("TRO")

[Docket No. 5] on April 25, 2006.  Id. ¶ 37.  Bremer's Application for a TRO was denied, and,

on May 2, 2006, the Indenture Trustee conducted the foreclosure sale of the Owner Trustee's

interest and Bremer's beneficial equity interest in the trust indenture estate.  May 2, 2006 Order;

Second Am. Compl. ¶ 38, Ex. M.  The winning bid submitted by VX Capital Partners ("VX") at

the foreclosure sale was $12,550,093.26, which was $100,000 more than the "credit bid" made

by the Indenture Trustee.  Second Am. Compl. ¶ 39, Ex. M.  U.S. Bank, acting in its capacity as

Owner Trustee, then signed a "Quitclaim Deed and Lease Assignment and Assumption

Agreement" to transfer the trust indenture estate to VX's designated buyer.  Id. ¶ 40, Ex. N.  On

May 18, 2006, the bankruptcy court held its continued hearing on Northwest's Rejection/New

Lease Motion.  Id. ¶ 40, Ex. O.  Bremer did not interpose any further objection at that time.  Id. ¶

41, Ex. O at 5-6.  The bankruptcy court granted Northwest's Motion and approved the term

sheet.  Id. ¶ 41, Ex. O at 7-9.

**D.      Bremer's Claims**

Bremer alleges that the actions by U.S. Bank at the direction of Hancock following

Northwest's filing for bankruptcy ultimately led to the foreclosure of Bremer's equity interest

and constituted breaches of express provisions of the Operative Documents, as well the implied

covenant of good faith and fair dealing.  Second Am. Compl. ¶¶ 43-46.  Bremer also alleges that

Hancock breached its contractual obligations when it directed U.S. Bank to conduct a

foreclosure sale that was not "commercially reasonable" in all respects as required by Article 9

of the New York Uniform Commercial Code ("NYUCC").  Id. ¶ 51.  The parties agree that the

Operative Documents require the application of New York law to Bremer's claims.  See Defs.'

Mem. in Supp. of Joint Mot. for Summ. J. [Docket No. 137] at 14; Bremer's Mem. in Supp. of

Mot. for Partial Summ. J. [Docket No. 142] at 30.

### III. DISCUSSION

**A.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Breach of Contract**

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994) (footnote omitted). Here, the issue is whether there has been a breach and damages.

**1.      Equity Squeeze**

Bremer claims that the events following Northwest's filing for bankruptcy, which ultimately led to the foreclosure of Bremer's equity interest, were in breach of express provisions of the Operative Documents. Specifically at issue is the equity squeeze provision of Section 4.04(a) of the Indenture, which provides:

> Remedies.   (a) If an Event of Default shall have occurred . . . the Indenture Trustee may exercise any or all of the rights and powers and pursue any and all of the remedies pursuant to this Article IV and, as a precondition thereto, in the event there shall have occurred

and be continuing [any Lease Event of Default[5]], shall declare the Lease to be in default and concurrently exercise, as appropriate, any and all of the remedies pursuant to Section 15 of the Lease and may take possession of all or any part of the properties covered or intended to be covered by the lien and security interested created hereby or pursuant hereto and may exclude the Owner Participant, the Owner Trustee and Lessee and all persons claiming under any of them wholly or partly therefrom provided that the Indenture Trustee shall give the Owner Trustee 20 days' prior written notice of its intention to sell the Aircraft. Without limiting any of the foregoing, it is understood and agreed that the Indenture Trustee may exercise any right of sale of the Aircraft available to it, even though it shall not have taken possession of the Aircraft and shall not have possession thereof at the time of such sale.

Second Am. Compl. Ex. B. § 4.04(a). Section 15 of the Lease provides, in pertinent part, that upon the occurrence of an Event of Default, the Lessor may declare the Lease to be in default, and may, "with respect to all or any part of the Airframe and any or all of the Engines . . . to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect," (1) take possession of the Airframe or any engine; (2) sell, hold, operate, use, or lease the Aircraft; (3) demand certain payments; or (4) rescind the Lease or "exercise any other right or remedy which may be available to it under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for breach hereof." Id. Ex. D § 15. Bremer contends these provisions prohibit Defendants from exercising remedies against Bremer under Section 4.04 of the Indenture unless U.S. Bank, as the Indenture Trustee, first declares the Lease to be in default and exercises remedies against Northwest under Section 15 of the Lease. Bremer claims that neither of these conditions were satisfied when Defendants

---

[5] A Lease Event of Default is, among other things, (1) failure to pay rent within ten business days after rent became due, (2) failure to make other payments due under the Lease, or (3) the commencement of a voluntary case under the federal bankruptcy laws. Second Am. Compl. Ex. D § 14.

exercised the Section 4.04 remedy of foreclosing on Bremer's equity interest.

### Declaration of Default

On October 19, 2005, and November 3, 2005, U.S. Bank issued notices stating that Northwest's filing for bankruptcy constituted an Event of Default under both the Lease and the Indenture. Martel Decl. [Docket No. 138] ¶¶ 2-3, Exs. A, B. But as Bremer notes, these notices expressly disclaimed that they constituted a declaration that the Lease was in default. Id. Defendants reply that two letters sent on March 28, 2006, and March 30, 2006, entitled "Notice of Acceleration and Notice of Public Sale of Collateral" (the "Acceleration Notice") clearly constitute a declaration by the Indenture Trustee that a Lease Event of Default had occurred. See Cohen Decl., Ex. S at 24-25.   The Acceleration Notice provides:

> You have previously received notice that an Event of Default has occurred and is continuing under Section 4.02(a) of the Indenture as a result of a Lease Event of Default arising under Section 14 of the Lease due to the commencement by Northwest of a voluntary case under the federal bankruptcy laws.
> . . . .
>
> The Indenture Trustee hereby declares all unpaid Principal Amount of all Secured Certificates currently outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder, to be immediately due and payable.
>
> The Indenture Trustee hereby further notifies you that the Indenture Trustee intends to sell the Owner Trustee's right, title and interest in the Aircraft, the Lease . . . by public action sale, unless a consensual foreclosure is negotiated.

Id. at 25.

The Acceleration Notice unequivocally announced that the filing of the bankruptcy petition was a Lease Event of Default, it declared all unpaid amounts under the Secured Certificates to be immediately due and payable, and it announced the Indenture Trustee intended

to exercise the remedy of selling the Aircraft at a public auction sale, as envisioned by Section 15 of the Lease.  The Indenture does not require that the Indenture Trustee employ any specific language, such as, "the Indenture Trustee hereby declares the Lease to be in default," when providing notice to the interested parties that the Lease is in default.  And, unlike the October 19 and November 3 notices, the Acceleration Notice did not contain a disclaimer that it was not to be construed as a declaration of default.  The Court finds that the terms of the Acceleration Notice clearly communicated that the Indenture Trustee had declared the Lease to be in default.

### Exercise of Remedies under Section 15 of the Lease

Bremer next contends that even if the requirement of declaring the Lease to be in default was satisfied, Section 4.04(a) of the Indenture was nevertheless breached when Defendants exercised remedies against Bremer under Section 4.04(a) without first having exercised remedies against Northwest under Section 15 of the Lease.[6]  Defendants respond that they did in fact exercise remedies under Section 15, as evidenced by the following actions: (1) entering into the Stipulation with Northwest pursuant to § 1110(b); (2) negotiating the restructuring term sheet; (3) pursuing rejection damages against Northwest; (4) serving the Acceleration Notice; and (5) conducting the May 2, 2006 foreclosure.  Defs.' Mem. in Supp. of Joint Mot. for Summ. J. at 19-20.  In support of their assertion that these actions constitute the exercise of Section 15 remedies,

---

[6] Bremer's contention that Defendants were required to exercise remedies against Northwest under Section 15 of the Lease *before* exercising remedies against Bremer under Section 4.04(a) runs contrary to the plain language of Section 4.04(a), which provides that when the event of default is a Lease Event of Default, the Indenture Trustee is required to "*concurrently*" exercise remedies under Section 15.  Second Am. Compl., Ex. D § 15 (emphasis added).  But even if the proper understanding of Section 4.04(a) is as Bremer suggests and Section 15 remedies must be exercised before Section 4.04(a) remedies are exercised, the actions by Defendants that are claimed to constitute the exercise of Section 15 remedies did occur before the exercise of Section 4.04(a) remedies.

Defendants cite <u>Lone Star Air Partners, LLC v. Delta Air Lines, Inc.</u>, 387 B.R. 426 (S.D.N.Y. 2008).

 <u>Lone Star</u> similarly concerned a leveraged lease transaction of an aircraft and the documents memorializing the transaction, the filing for bankruptcy by the airline leasing the aircraft, the foreclosure by the indenture trustee of the owner participant's equity interest, and the subsequent public sale of the aircraft. <u>Id.</u> at 427-430. Like Section 15 of the Lease in this case, section 15 of the lease in <u>Lone Star</u> empowered the indenture trustee to, upon the occurrence of a lease event of default, "'exercise any . . . right or remedy [that] may be available under applicable law' including sale of the Aircraft." <u>Id.</u> at 432 (alterations in original). The dispute in <u>Lone Star</u>, like in the instant case, centered on whether the negotiation of a term sheet calling for the restructuring of the lease, as well as the notice of foreclosure and subsequent holding of a public auction of the aircraft, constituted the exercise of remedies under section 15. <u>Id.</u> The bankruptcy court concluded that the negotiation of and entry into a term sheet that restructured the lease did not constitute an exercise of remedies under section 15 for two reasons: first, the authority to negotiate and enter into the term sheet came not from section 15 of the lease but rather from "'the inherent power of any party to contractual arrangements to renegotiate the terms of those arrangements,'" and second, the entry into the term sheet "contemplated at most 'the *future* exercise of a remedy under the Leases when there would be a *future* foreclosure on the [Aircraft].'" <u>Id.</u> at 432-33 (quoting <u>In re Delta Air Lines, Inc.</u>, No. 05-17923, 2007 WL 2932774, at *5 (Bankr. S.D.N.Y. Oct. 5, 2007) (alteration in orginal). The bankruptcy court similarly determined that the notice of foreclosure and subsequent public auction did not constitute an exercise of remedies. <u>See</u> <u>In re Delta</u>, 2007 WL 2932774, at *6.

The district court reversed on both issues.  Lone Star, 387 B.R. at 433.  With regard to the negotiation of and entry into the term sheet, the district court held:

> Regardless of the source of the Indenture Trustee's authority to enter into the . . . Term Sheet, that action qualifies as an exercise of a remedy under Section 15(f) of the Leases.  That section explicitly encompases "any . . . right or remedy [that] may be available under applicable law . . . ."  This language means what it says—that any steps authorized by law and taken by Lone Star (and, by extension, the Indenture Trustee) to remedy a default constitute the exercise of a remedy under Section 15(f).  The renegotiation of the Leases following Delta's default falls within the broad purview of this language.

Id.  The district court further concluded that the indenture trustee's actions in giving notice of foreclosure and holding an auction were the exercise of section 15 remedies because they were "part of the activity of selling the Aircraft" and section 15 of the lease is "the only provision" that authorizes selling the aircraft.  Id.

Bremer contends that Lone Star, currently on appeal to the Second Circuit, was wrongly decided.  Relying on an argument presented by the appellant in Lone Star, Bremer claims other language in Section 15 of the Lease shows that the parties contemplated and intended that there be a difference between "steps leading up to the exercise of a remedy" and the "exercise of a remedy."  Bremer's Corrected Mem. in Opp'n to Defs.' Mot. for Summ. J. [Docket No. 168] at 19; Ratelle Suppl. Decl. [Docket No. 164] ¶ 9, Ex. 8 ("Delta Brief") at 26-27.  The relevant language reads:

> Except as otherwise expressly provided above, no remedy referred to in this Section 15 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity; and the exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies.

Second Am. Compl., Ex. D § 15.  Bremer concludes, therefore, that the absence of the phrase "beginning of exercise" from Section 4.04(a) is a testament to the parties' intent that the requisite condition in Section 4.04(a) be satisfied only by the exercise of Section 15 remedies and not by the beginning of or steps leading up to the exercise of Section 15 remedies.  Bremer's argument is unavailing.

The term "exercise" is commonly understood to mean "[a]n act of employing or putting into play" or "[t]o put into play or operation."  The American Heritage Dictionary of the English Language 622 (4th ed. 2000).  Steps leading up to the ultimate implementation of a remedy are themselves part and parcel of the act of exercising, as that term is commonly understood.  To construe the term in a manner that recognizes the distinction advanced by Bremer would render it virtually impossible to make a principled distinction between, on the one hand, an act that is merely a "step leading up to the exercise of a remedy" and, on the other hand, an act that rises to the level of constituting "the exercise of a remedy."  As the court in Lone Star noted, the operative portions of Section 15 do not "distinguish among incremental movements toward a remedy" and "[t]o hold otherwise would impose an unduly formalistic approach that is not supported by the plain language of that section."  387 B.R. at 433.

Bremer also contends that the facts of this case are distinguishable from Lone Star.  First, Bremer points out that the term sheet in Lone Star had been approved by the bankruptcy court before the foreclosure, which is not the case here.  But this distinction is without a difference.  Although the bankruptcy court here had not formally approved the term sheet, it had given its approval of the "Summary of Terms and Conditions."  See See May 2, 2006 Order [Docket No. 17] at 2-3.  Furthermore, the focus is properly on the actions taken by the Indenture Trustee to

renegotiate or restructure the Lease in deciding whether there has been an exercise of remedies, not the subsequent *approval* (or lack thereof) of the term sheet reflecting the result of those negotiations.[7]  Second, Bremer contends that unlike <u>Lone Star</u>, the Indenture Trustee here never declared that the Lease was in default.  As previously discussed, the Acceleration Notice constituted a declaration that the Lease was in default, and Bremer's arguments to the contrary are unavailing.

In sum, the Court finds that U.S. Bank's actions (at the direction of Hancock) following Northwest's default constituted the exercise of remedies under Section 15 of the Lease.  The broad language of Section 15 empowers the Indenture Trustee to "exercise any . . . remedy . . . available . . . under applicable law."  Second Am. Compl., Ex. D § 15.  The efforts to renegotiate

---

[7] Bremer asserts that in any event, the negotiation of the term sheet cannot constitute the exercise of a remedy because the Stipulations that were entered into expressly "precluded [the Indenture Trustee] from exercising any remedies against [Northwest] under the Operative Documents except upon an uncured failure on the part of [Northwest] to perform an obligation under the Stipulation[s]."  Bremer's Mem. in Supp. of Mot. for Partial Summ. J. at 11.  The language in the Stipulations on which Bremer relies provides:

> In the event the Debtors fail to perform any of their obligations under this Stipulation, such failure shall constitute an event of default under this Stipulation and the [Operative Documents] . . . .  Upon the occurrence of such an event of default, the Aircraft Creditors shall thereupon be permitted to exercise any and all rights, claims and remedies with respect thereto as it may have under the [Operative Documents] and the Bankruptcy Code . . . .

Ratelle Aff., Ex. G ¶ 15.  This language is not preclusive, and the Court does not read it as having the effect that Bremer claims it does.  To the contrary, the Stipulations make explicitly clear that the creditors reserved all rights pursuant to the Bankruptcy Code and the Operative Documents and permit the Indenture Trustee to, *in addition to* those rights (including the right to exercise remedies upon a default under the Operative Documents), exercise remedies upon a failure by Northwest to perform an obligation under the Stipulations.  Ratelle Aff., Ex. G ¶¶ 13-15.

the Lease following Northwest's default, which resulted in the term sheet, fall within the ambit

of such wide-ranging language, whether the authority to do so arose from the terms of the Lease

itself or, as expressed by the bankruptcy court in Lone Star, from "the inherent power of any

party to contractual arrangements to renegotiate the terms of those arrangements."[8] In re Delta,

2007 WL 2932774, at *5.  The Acceleration Notice informing the interested parties of the

foreclosure and the auction of the Aircraft also was the exercise of a remedy under Section 15 of

the Lease, which expressly recognizes the Indenture Trustee's power to sell the Aircraft as

constituting the exercise of a remedy.

### 2.      Good Faith and Fair Dealing

Bremer also claims that conduct following Northwest's filing for bankruptcy breached

the implied covenant of good faith and fair dealing.  "In New York, all contracts imply a

covenant of good faith and fair dealing in the course of performance."  511 West 232nd Owners

Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002).  However, New York law does

not recognize a separate cause of action for breach of the implied covenant of good faith and fair

dealing when it is based on the same facts as a breach of contract claim.   Harris v. Provident

Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).  Courts therefore dismiss claims for

breach of the implied covenant of good faith as redundant or duplicative when "the conduct

---

[8] In further support of its claim that Hancock, in directing U.S. Bank, breached its
contractual obligations and acted in bad faith in renegotiating the lease and entering into the term
sheet, Bremer alleges that when Northwest filed for bankruptcy the parties originally
contemplated a negotiation of an "amendment" to the Lease but that Hancock subsequently
hijacked the negotiations, excluded Bremer, and insisted on a "rejection" of the Lease and
negotiation of a new lease rather than an amendment of the Lease.  This conclusory allegation
regarding which party was responsible for the change and what the reasons for the change were
lacks support in the record and is insufficient to avoid summary judgment.  See Dunavant v.
Moore, 907 F.2d 77, 80 (8th Cir. 1990).

allegedly violating the implied covenant is also the predicate for a claim of breach of an express provision of the underlying contract," Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005), or when "the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract," Hawthorne Group v. RRE Ventures, 776 N.Y.S.2d 273, 276 (N.Y. App. Div. 2004) (quotation omitted).  See also B&F Prod. Dev., Inc. v. Fasst Prods. LLC, 22 Misc. 3d 1107A, *26 (N.Y. Sup. Ct. Jan. 13, 2009); Deer Park Enters., LLC v. Ail Sys., Inc., 870 N.Y.S.2d 89, 89 (N.Y. App. Div. 2008).  Thus, a claim for breach of the implied covenant of good faith can survive "only if it is based on allegations different [from] those underlying the accompanying breach of contract claim." Siradas v. Chase Lincoln First Bank, No. 98 Civ. 4028, 1999 WL 787658, at *6 (S.D.N.Y. Sept. 30, 1999).[9]

Bremer alleges that the actions that were taken after Northwest filed for bankruptcy were intended to strip Bremer of its equity interest and violated the implied covenant.  The same allegation regarding the actions taken and the intent behind those actions is the predicate for Bremer's claim of a breach of Section 4.04(a) of the Indenture and various related provisions of the Operative Documents.  See Second Am. Compl. ¶¶ 43 - 52; Bremer's Mem. in Supp. of Mot. for Summ. J. at 32-33.  Plainly, the claim for breach of the implied covenant is based on the same conduct as the claim for breach of the express provisions of the Operative Documents.

---

[9] An exception to the rule requiring dismissal of a duplicative claim for breach of the implied covenant of good faith claim, exists when the claim is argued in the alternative to a breach of contract claim.  See Fantozzi v. Axsys Technologies, Inc., No. 07 Civ. 02667, 2008 WL 4866014, at *7 (S.D.N.Y. Nov. 6, 2008).  Here, however, the claim for breach of the implied covenant has not been asserted as alternative to the breach of contract claim, and, thus, the exception is inapplicable.

Unlike a typical claim for breach of the implied covenant of good faith, Bremer does not assert that although the literal terms of the contract were followed, Hancock nonetheless acted in bad faith.  Rather, Bremer's claim hinges on whether Hancock, in directing U.S. Bank to act as it did, acted with the purpose of squeezing Bremer out of its equity position and whether such conduct breached both express provisions of the Operative Documents and the implied covenant of good faith and fair dealing.  Accordingly, Bremer's claim for breach of the implied covenant is duplicative, and summary judgment in favor of Defendants is granted.  See EUA Cogenex Corp. v. North Rockland Cent. School Dist., 124 F. Supp. 2d 861, 873 (S.D.N.Y. 2000) (granting summary judgment to a defendant on a claim for breach of the implied covenant of good faith because the claim was duplicative of a claim for breach of an express provision of the contract).

### 3.    Commercial Reasonableness

Finally, Bremer claims that Hancock breached its contractual obligations to Bremer by issuing binding instructions to U.S. Bank as the Indenture Trustee that caused the Indenture Trustee to conduct a foreclosure sale that was not commercially reasonable as required by Article 9 of the NYUCC.  The relevant section of Article 9 provides that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b).  Essentially, the question is whether the secured party "acted in good faith and to the parties' mutual best advantage." 108th Street Owners Corp. v. Overseas Commodities Ltd., 656 N.Y.S.2d 942, 942 (N.Y. App. Div. 1997).  In evaluating whether disposition of collateral was commercially reasonable, New York courts consider whether the resale price was optimal (the "proceeds" test), and whether the procedures used conform to commercially accepted standards (the "procedures" test).  See In re Sackman

18

Mortgage Corp., 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993) (explaining that the New York

Court of Appeals in Bankers Trust Co. v. J.V. Dowler & Co., 417 N.Y.2d 47, 135 (N.Y. 1979)

implicitly validated both tests for commercial reasonableness).[10]

Bremer asserts that by applying the proceeds test, the foreclosure sale is shown to be

commercially unreasonable.  Because the value of the Aircraft, the accompanying lease, and the

unsecured claim was, according to Bremer, more than $20,000,000, the winning bid of

$12,550,093.26 for the indenture estate is argued to be "grossly inadequate."  Bremer's Mem. in

Supp. of Mot. for Partial Summ. J. at 39-41.  But, as Defendants point out, to arrive at this

calculation, Bremer relies heavily on a figure from a plan of reorganization filed in March 30,

2007, in Northwest's bankruptcy case estimating the hypothetical recovery on unsecured claims.

The Court agrees with Defendants that this plan of reorganization, which was prepared only two

months before Northwest emerged from bankruptcy and nearly a year after the foreclosure sale,

has no bearing on what the value of the indenture estate was when the foreclosure sale was

conducted.

Even if the value of the indenture estate was ultimately found to be greater than the

winning bid at the foreclosure sale, "the mere fact that a better price could have been obtained by

a sale at a different time or in a different method from that selected by the secured party is not of

itself sufficient to establish that the sale was not made in a commercially reasonable manner."

Fed. Deposit Ins. Corp. v. Herald Square Fabrics, 439 N.Y.S.2d 944, 954-55 (N.Y. App. Div.

1981) (quotation omitted).  Under New York law, the inadequacy of price, by itself, is

---

[10] The parties agree commercial reasonableness is determined by consideration of both proceeds and procedures.  See Bremer's Mem. in Supp. of Mot. for Partial Summ. J. at 39; Defs.' Mem. in Opp'n to Bremer's Mot. for Partial Summ. J. [Docket No. 160] at 26-27.

insufficient to conclude that a foreclosure was not commercially reasonable unless the price is "so low as to shock the conscience of the court."  NYCTL 1999-1 Trust v. NY Pride Holdings, Inc., 825 N.Y.S.2d 521, 522 (N.Y. App. Div. 2006).  The rule is well-founded given that "a low price obtained for collateral . . . is not necessarily the result of a commercially unreasonable sale, but can merely indicate a lack of demand for the collateral."  In re Sackman, 158 B.R. at 936. "When [a] sale is conducted so as to give a sufficiently broad group of buyers the opportunity to bid, their failure to respond in any particular number may itself be an indication of the market value of the item offered for sale."  Bankers Trust, 417 N.Y.S.2d at 51.  Here, the winning bid at the foreclosure was $100,000 greater than the debt and expenses owed on the Secured Certificates.  See Cohen Decl., Ex. U at 8-9.  The winning bid was consistent with (1) the conclusions of U.S. Bank's expert and Hancock's expert regarding the value of the Aircraft, the accompanying lease, and the unsecured claim and (2) the conclusion of an expert retained by RPK Capital, LLC, one of the bidders at the foreclosure sale.  Id., Ex. Y at 3, Ex. AA at 12, Ex. AD at 1.  In short, the proceeds test fails to show that the foreclosure sale was commercially unreasonable.[11]

      In support of its claim that the procedures were not commercially reasonable, Bremer

---

[11] Defendants argue that Bremer's own actions (or more appropriately, inaction) contravene its assertion that the proceeds of the foreclosure sale were significantly less than the value of the indenture estate and that Bremer was squeezed out of its equity interest.  Defendants maintain if Bremer truly believed that the value of the indenture estate exceeded the bids that were submitted at the foreclosure sale, Bremer could have submitted its own bid to protect its equity interest.  The fact that Bremer chose not to do so, Defendants explain, suggests that (1) the bid at the foreclosure sale was commercially reasonable and (2) any loss by Bremer of its equity interest was attributable to its own decision not to bid to protect that interest.  Although not conclusive on the issue of whether the proceeds were commercially reasonable, the Courts finds the argument well reasoned and persuasive.

cites (1) Hancock's alleged failure to follow the contractually agreed upon procedures regarding foreclosure; (2) the short time span between the March 30, 2006 Acceleration Notice and the May 2, 2006 sale; (3) the "lack of availability of the Aircraft for inspection," and (4) Defendants' description of the Aircraft (and the accompanying lease) to prospective bidders, which Bremer contends was "seriously misleading and designed to discourage bidding."  As to the first assertion, the Court has previously concluded that Defendants did not breach their contractual obligations under the Operative Documents.  The inquiries of 31 potential bidders expressing interest in the Aircraft belies Bremer's contention of an inadequate time period to publicize the foreclosure sale.  Cf. Derosa v. Chase Manhattan Mortg. Corp., 782 N.Y.S.2d 5, 9 (N.Y. App. Div. 2004) (assertion that the foreclosure sale was inadequately advertised was insufficient to show commercial unreasonableness "absent a showing that . . . prospective bidders were prevented from attending" the foreclosure sale) (citation omitted).  Additionally, Bremer relies on an out of context statement in a declaration by the vice president of the firm hired to market the foreclosure sale.  Although this individual opined in a hypothetical sense that it would take six to eighteen months to market and then reconfigure and overhaul the Aircraft to sell and lease it to an airliner other than Northwest, the parties never intended on pursuing such a course of action.  It was always intended that after the foreclosure sale, Northwest would continue to lease the Aircraft under new terms.  Ratelle Aff., Ex. O, Medland Decl. ¶ 14.  The vice president never suggested that it would take six to eighteen months to adequately advertise the foreclosure sale in this context.  With regard to the claim that the Aircraft was not available for inspection by potential bidders, the record is devoid of any evidence to support such an allegation.  There is no evidence of physical access being denied to anyone.  Potential bidders who expressed interest

did not request physical access to the Aircraft, but rather requested (and were provided) the

technical specifications and the lease documentation to assist them in deciding whether to submit

a bid.  Cohen Decl., Ex. T at 3-4.

Lastly, Bremer's allegation that Defendants issued a description of the indenture estate

that was false, misleading, and intended to discourage bidding is based on the following

language, which was communicated to parties who had inquired about the status of the lease:

> Please be aware that the lease is in default, and that the Secured party
> will terminate the Lease prior to conveyance of title to the winning
> bidder.  Upon transfer of title, the buyer will own whatever rights, if
> any, that exist in or arise from the terminated lease.  The Secured
> Party makes no representation as to the existence, enforceability, or
> value of any such rights.

> Please also be aware that Northwest . . . and the Secured Party have
> entered into a term sheet for a restructured lease for a new lease with
> respect to the aircraft . . . .  The hearing to approve the term sheet has
> been scheduled for a date occurring after the date scheduled for the
> foreclosure sale.  As such, the term sheet will not have been approved
> by the bankruptcy court at the time of the foreclosure sale.  The
> Secured Party makes no representation with respect to the term sheet
> including . . . that any provision proposed in the Term Sheet is
> available to any bidder (other than the holders of the secured
> certificates).  The Secured Party is not able to negotiate a lease or any
> other arrangements with Northwest . . . on behalf of any bidder (other
> than the holders of the secured certificates).

Ratelle Aff., Ex. T at 9.  The communication accurately informs potential bidders of the

uncertainty with regard to whether a new lease with Northwest would be finalized and the

potential implications to the future purchaser.  There is no credible evidence that Defendants

made false, misleading, or disparaging remarks about the nature of what was to be sold at the

foreclosure sale and that the purpose for doing so was to discourage potential bidders.

The procedures in a foreclosure sale are commercially reasonable if they conform to the

"reasonable commercial practices among dealers in the type of property that was the subject of the [foreclosure]."  Coxall v. Clover Commercial Corp., 781 N.Y.S.2d 567, 574 (N.Y. City Civ. Ct. 2004) (quotation omitted).  As Defendants emphasize, (1) the notice of the foreclosure sale was given to both Northwest and Bremer; (2) the foreclosure sale was published for one month in four trade publications and on an aircraft trading website, Planemart.com, that had 830 aircraft listed and received approximately 15,000 hits per day; (3) U.S. Bank directly contacted 448 entities and individuals that it thought might be interested in purchasing the Aircraft; and (4) follow-up discussions were conducted with 31 potential bidders who had submitted inquiries. Viewed in the totality of the circumstances, the procedures employed in the foreclosure sale were commercially reasonable.  See President Container, Inc. v. Patimco, 440 N.Y.S.2d 313, 314 (N.Y. App. Div. 1981) (noting that the question of commercial reasonableness must be considered under the totality of the circumstances).

The actions that Hancock directed U.S. Bank to take following Northwest's filing for bankruptcy and culminating in the foreclosure sale were not in breach of the express provisions of the Operative Documents or the implied covenant of good faith and fair dealing.  Nor did Hancock breach its contractual obligations by directing the Indenture Trustee to conduct the foreclosure sale because the foreclosure sale was commercially reasonable.  These conclusions preclude the need for the Court to address the parties' arguments on whether Bremer's claim fails as a matter of law for failure to show any damages as a result of an alleged breach.

## C.    Indemnification of Legal Fees and Expenses

Hancock has also moved for summary judgment on its counterclaim for indemnification of legal fees and expenses. As an initial matter, Bremer argues that although Hancock asserted

the counterclaim in its original Answer [Docket No. 40], Hancock failed to assert the

counterclaim for indemnification in its Answer to the Second Amended Complaint [Docket No.

80].  Therefore, Bremer concludes, the counterclaim must be denied.

In Johnson v. Berry, a defendant filed an answer that included a counterclaim, the

plaintiff later filed an amended complaint, and the defendant then moved several months later for

summary judgment but did not file an answer to the amended complaint.  228 F. Supp. 2d 1071,

1079 (E.D. Mo. 2002).  Describing the circumstances as "present[ing] an issue of civil procedure

unusual in the Court's experience," the court concluded that "[b]y failing to plead in response to

the first amended complaint, and therein to replead his counterclaim, [the defendant] abandoned

his counterclaim, which effectively dropped from the case."  Id.  The court reasoned: Rule 15(a)

of the Federal Rules of Civil Procedure "requires a party to plead in response to an amended

pleading.  No option is given to merely stand on preexisting pleadings made in response to an

earlier complaint.  As the language of Rule 13(a) and (b) makes clear, a counterclaim is part of

the responsive pleading."  Id.; see also General Mills, Inc. v. Kraft Foods Global, Inc., 495 F.3d

1378, 1380-81 (8th Cir. 2007) (indicating agreement with the reasoning supporting the decision

in Johnson but deeming a counterclaim that was not replead in an answer to an amended

complaint as "no longer having been pending" rather than as "having been abandoned").  But see

Dunkin Donuts, Inc. v. Romanias, No. Civ.A.00-1886, 2002 WL 32955492, at *2 (W.D. Pa. May

29, 2002) (rejecting the argument that the failure to replead a counterclaim in an answer to an

amended complaint is fatal on the ground that "an answer responds to the allegations in a

complaint, a counterclaim is something independent," and thus, "[r]evisions to a complaint do

not require revisions to a counterclaim").

24

The legal basis for deeming Hancock's counterclaim to be abandoned or no longer pending is sound. From a practical standpoint, Hancock's failure to replead the counterclaim, together with nearly two years passing without discovery or any action on the counterclaim casts doubt on whether the counterclaim was ever viewed as being meritorious. But even if the counterclaim were still pending, the Court agrees with Bremer that the counterclaim fails as a matter of law.

Section 7.01 of the Indenture, Hancock's asserted basis for the counterclaim, provides:

> The Owner Trustee . . . hereby agrees . . . to assume liability for, and does hereby indemnify, protect, save and keep harmless the Indenture Trustee, and its successors, assigns, agents and servants, from and against any and all . . . actions, suits, costs, expenses or disbursements (including legal fees and expenses) . . . which may be imposed on, incurred by or asserted against the Indenture Trustee . . . in any way relating to or arising out of [the Operative Documents] . . . .

Cohen Decl., Ex. D § 7.01. Hancock contends that when Bremer brought this action, it "assumed the role of the Owner Trustee" and forced Hancock to "act as a de facto 'agent' of the Indenture Trustee." Answer [Docket No. 40] Counterclaim ¶ 25. Thus, because Bremer was acting as the Owner Trustee and the Owner Trustee is required to indemnify the Indenture Trustee, Bremer is required to indemnify Hancock, which was acting as the Indenture Trustee. Id. ¶¶ 25-26. Hancock claims that "[b]y bringing this lawsuit, Bremer has abandoned its role as a passive investor and assumed for itself the Owner Trustee's rights and powers," and, therefore, "[f]airness dictates that Bremer also assume the obligations of the Owner Trustee, including indemnification of legal fees and expenses." Defs.' Mem. in Supp. of Joint Mot. for Summ. J. at 34.

Section 7.01 of the Indenture requires the Owner Trustee to indemnify the Indenture

Trustee for any legal fees incurred by the Indenture Trustee; it does not create any indemnification rights as between an Owner Participant and a Loan Participant.  Nothing in the Operative Documents supports the proposition that the filing of this lawsuit by Bremer somehow transformed Bremer, into the Owner Trustee and that Hancock, by defending the lawsuit, was somehow transformed into the Indenture Trustee.  In addition, Hancock cites no authority for such a proposition.  Bremer's claim against Hancock is not an indirect claim against the Indenture Trustee asserted by the Owner Trustee but rather a direct claim alleging that Hancock, in its capacity as Loan Participant and Certificate Holder, breached its contractual obligations under the Operative Documents owed to Bremer, in its capacity as Owner Participant.

Hancock's counterclaim for indemnification of legal fees and expenses fails as a matter of law, and summary judgment on the counterclaim is therefore granted in favor of Bremer.[12]

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Bremer's  Motion for Partial Summary Judgment [Docket No. 141] is **DENIED**.

2.    Defendants' Joint Motion for Summary Judgment [Docket No. 135] is

---

[12] Bremer did not expressly request summary judgment on Hancock's counterclaim in its Motion for Summary Judgment.  It is within a district court's power, however, to grant summary judgment sua sponte against the moving party and in favor of the nonmoving party when "the party against whom the judgment is entered has had a full and fair opportunity to contest that there are no genuine issues of material fact to be tried and the party granted judgment is entitled to it as a matter of law."  Burlington N. R.R. Co. v. Omaha Public Power Distr., 888 F.2d 1228, 1231 n.3 (8th Cir. 1989).  The merits of Hancock's counterclaim depends on the proper interpretation and application of a provision of the Indenture.  Both parties have submitted arguments on that legal question, Bremer has asserted that the claim is untenable, and neither party has contended that there are any fact issues that preclude the Court from rendering judgment as a matter of law on the counterclaim.

**GRANTED** as to the claims in Bremer's Second Amended Complaint [Docket No. 71]; and **DENIED** as to Hancock's counterclaim for  indemnification of legal fees and expenses; and

3.      Summary Judgment is **GRANTED** to Bremer on Hancock's counterclaim for indemnification of legal fees and expenses.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                        BY THE COURT:


                                        _____s/Ann D. Montgomery_____
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  March 13, 2009.